UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROY WEST,<br><br>        Plaintiff,<br><br>    v.<br><br>PATRICK WITHROW, *et al.*,<br><br>        Defendants. | Case No. 2:25-cv-0537-JDP (P)<br><br><br>ORDER |

Plaintiff, a state pretrial detainee proceeding pro se, brings this § 1983 action against fifty-nine defendants, alleging that they provided him inadequate medical care and thus violated his Fourteenth Amendment rights. ECF No. 1. He also moves to proceed *in forma pauperis*. ECF No. 6. For the purposes of screening, plaintiff has sufficiently alleged Fourteenth Amendment claims against defendants Dr. Kym, Plosser, Mendoza, Fanzia, Darren, and Does 5 through 50 for inadequate medical care. However, his allegations fail to state cognizable Fourteenth Amendment claims against the remaining defendants. Plaintiff may, if he chooses, file an amended complaint that addresses the deficiencies noted herein, or he may proceed only on the cognizable Fourteenth Amendment claims. I will deny as moot plaintiff's request to proceed in forma pauperis, as he has paid the filing fee.[1]

---

[1] I will also withdraw my prior Order and Findings and Recommendations regarding this matter, ECF No. 7

1

**Screening and Pleading Requirements**

A federal court must screen the complaint of any claimant seeking permission to proceed *in forma pauperis*. *See* 28 U.S.C. § 1915(e). The court must identify any cognizable claims and dismiss any portion of the complaint that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. *Id.*

A complaint must contain a short and plain statement that plaintiff is entitled to relief, Fed. R. Civ. P. 8(a)(2), and provide "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard does not require detailed allegations, but legal conclusions do not suffice. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the allegations "do not permit the court to infer more than the mere possibility of misconduct," the complaint states no claim. *Id.* at 679. The complaint need not identify "a precise legal theory." *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1038 (9th Cir. 2016). Instead, what plaintiff must state is a "claim"—a set of "allegations that give rise to an enforceable right to relief." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1264 n.2 (9th Cir. 2006) (en banc) (citations omitted).

The court must construe a pro se litigant's complaint liberally. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). The court may dismiss a pro se litigant's complaint "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hayes v. Idaho Corr. Ctr.*, 849 F.3d 1204, 1208 (9th Cir. 2017). However, "'a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled.'" *Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997) (quoting *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982)).

**Analysis**

Plaintiff brings this action against fifty-nine identified and unidentified defendants: Sheriff Patrick Withrow and Captain Samuel Cortez at the San Joaquin County Jail ("SJCJ"), as well as Rosalisa, Dr. Kym, Taylor Vos, Ma Del Carmen Plosser, Robyn Mendoza, Fanzia, and Darren,

health care providers at SJCJ, and John Doe defendants 5 through 50. ECF No. 1 at 3-4.[2] He contends that these defendants provided inadequate medical care under the Fourteenth Amendment when they refused to properly address his medical needs, leading to him enduring multiple partial foot amputations and partial deafness. *See id.* at 5-23.

Plaintiff alleges that in August 2022, he was a pretrial detainee at SJCJ awaiting his criminal retrial. *Id.* at 5. He asserts that he is a long-time diabetic who suffered from neuropathy in his lower extremities. *Id.*

Plaintiff alleges that on August 31, 2022, he was receiving medical care for his left toe. *Id.* He alleges that during this treatment, he informed Rosalisa that he had an open blister on his right big toe, and Rosalisa refused to look at the wound and told plaintiff to submit a medical request to have the toe examined. *Id.* He alleges that he submitted a medical request, but he did not receive any medical care. *Id.* On September 7, during Rosalisa's routine cleaning of plaintiff's left toe, plaintiff alleges that he again told Rosalisa that his right big toe needed medical attention because the wound had changed colors and grown. *Id.* Rosalisa again told plaintiff to submit a medical request form because she was not there to examine plaintiff's other injuries. *Id.*

Plaintiff alleges that on September 15, he saw another SJCJ medical employee who examined his right big toe and immediately sent him to Dr. Kym. *Id.* at 6. Dr. Kym examined the toe and sent plaintiff to a nearby hospital. *Id.* At the hospital, plaintiff alleges that he received IV antibiotics and other medical care, and he was later informed that his toe had gangrene and needed to be amputated. *Id.* Two days later, plaintiff's right big toe was amputated due to the infection. *Id.* After surgery, the surgeon informed plaintiff that he needed to clean his amputation site everyday using betadine, the cavity needed to be packed with betadine, and it needed to be wrapped with a dry sterile gauze. *Id.* at 7. These instructions were in plaintiff's

---

[2] Plaintiff originally refers to Rosalisa, Dr. Kym, Fanzia, and Darren as John Does 1 through 4, *see* ECF No. 1 at 3-4, but because these defendants are identified by name in the complaint, this order will not refer to them as "John Doe" defendants.

discharge papers, which plaintiff alleges he provided to the SJCJ's Medical Housing Unit upon his arrival back to jail. *Id.*

Plaintiff alleges that between September 22 to 29, his amputation site was not cleaned with betadine but was instead cleaned and packed with saline-soaked gauze. *Id.* He alleges that he was also not given any walking devices to assist in his movement to take the pressure off his amputation site, such as a cane, walker, or wheelchair. *Id.*

Plaintiff alleges that on September 30, he saw Dr. Kym, and Dr. Kym informed plaintiff that his amputation site was beginning to discharge fluids. *Id.* Dr. Kym told plaintiff to make sure medical staff were cleaning his wound with betadine and packing it with betadine-soaked gauze, and that he should not be putting pressure on his right foot. *Id.* He alleges that, despite these instructions, Doe defendants continually cleaned his wound with saline and packed it with saline-soaked bandages, and he was not provided a walking device. *Id.* at 7-8.

Plaintiff alleges that on October 7, during a routine cleaning, he asked a Doe defendant why he was not being treated with betadine, and the employee stated, "we've always been using saline." *Id.* at 8. He alleges that he informed the Doe defendant that his discharge paperwork stated he needed to be treated with betadine and noted that his wound looked worse. *Id.* According to plaintiff, his amputation site was swelling, becoming discolored, was discharging a thick fluid, and had a pungent odor. *Id.* However, the Doe defendant allegedly sent plaintiff back to his cell, and he was not provided antibiotics or additional care for his worsening wound. *Id.*

Plaintiff alleges that on October 26, Vos conducted a visual exam of his wound and sent him to the hospital. *Id.* at 9. While at the hospital, plaintiff was given IV antibiotics and other treatment. *Id.* He alleges that his wound had become infected, and that the surgeon later amputated the remainder of his right big toe and some of his foot. *Id.* After this amputation, the surgeon again told plaintiff that his wound needed to be treated with betadine daily. *Id.* This information was contained in plaintiff's discharge paperwork and allegedly provided to SJCJ medical staff. *Id.* Nevertheless, Doe defendants treated plaintiff's wound with saline between November 6 through 15. *Id.* Plaintiff alleges that he continued to ask the Doe defendants why

4

they were not using betadine, and he was met with the same response of, "we always use saline." *Id.*

Plaintiff alleges that on November 15, during a routine wound cleaning, he informed Plosser that his amputation site needed to be cleaned with betadine, but Plosser continued using saline. *Id.* at 10. He also told Plosser that his wound looked infected, because it was becoming discolored and discharging a foul-smelling thick liquid. *Id.* Plosser told plaintiff his wound looked "fine" and sent him back to his cell. *Id.* He alleges that he continued to receive saline cleanses to the wound. *Id.*

Plaintiff alleges that on November 25, Plosser conducted another routine check, and he again raised concerns about his wound. *Id.* at 10-11. Plosser told plaintiff she would have a doctor examine plaintiff's wound, but plaintiff alleges no doctor ever examined his wound, and he continued to receive saline cleanses despite his efforts to obtain betadine. *Id.* at 11.

Plaintiff alleges that it was not until December 25 that Plosser took his complaints seriously because he was running a 103-degree fever. *Id.* at 12. He alleges that Plosser immediately sent him to the hospital, where he received additional medical treatment. *Id.* While at the hospital, he was informed that additional infections had spread in his right foot, that he had gangrene, and that his second right toe had to be amputated. *Id.* at 12. On January 4, 2023, plaintiff was returned to the SJCJ with wound-care instructions that stated he needed betadine cleanses to the amputation site. *Id.* However, plaintiff alleges that between January 5 to February 1, he continued to receive saline cleanses and was not provided with a walking aide. *Id.* at 12-13.

On February 1, plaintiff alleges that Darren conducted a visual examination of plaintiff's foot. *Id.* at 13. Plaintiff alleges that his right foot was swollen, bright pink, and hot to the touch. *Id.* The wound was also leaking a thick fluid and had a putrid smell. *Id.* Darren told plaintiff a doctor would look at his foot, but no doctor came, and between February 2 to 23, Doe defendants continued to give him saline-based cleanses. *Id.*

Plaintiff alleges that on February 23, an unidentified medical worker conducting plaintiff's routine wound care sent plaintiff to the hospital due to how his amputation wound

5

1  looked. *Id.* at 14. At the hospital, plaintiff alleges that he was told his right foot was infected,
2  and he would need his third right toe amputated. *Id.* After amputation, plaintiff alleges that he
3  was again given discharge instructions explaining that the wound needed to be treated with
4  betadine and that this information was given to SJCJ medical staff. *Id.* He alleges that despite
5  these instructions, his wound was cleaned with saline only. *Id.*

6  Plaintiff alleges that on March 6, Mendoza conducted a visual exam of his foot, and
7  plaintiff complained of swelling and warmth around his wound. *Id.* at 15. Mendoza prescribed
8  plaintiff antibiotics and sent him back to his cell. *Id.* He alleges that Doe defendants continued to
9  clean his wound with a saline solution during this period. *Id.* On March 16, he alleges that he
10 complained about his wound again, noting that it had turned black, was leaking a thick fluid, and
11 had a bad odor. *Id.* at 15-16. The Doe defendant told plaintiff that they would "keep an eye on
12 it," and sent plaintiff to his cell. *Id.* at 16. Plaintiff's wound continued to be treated with saline
13 only. *Id.*

14 Plaintiff alleges that on March 27, he began feeling disoriented in his cell. *Id.* He alleges
15 that he passed out on the floor of his cell, and when he regained consciousness, he pressed the
16 emergency alert button. *Id.* He alleges that he was nauseated and had gone deaf in his left ear,
17 and then he lost consciousness a second time. *Id.* He alleges that when he awoke, a SJCJ deputy
18 was standing at his cell door. *Id.* The deputy asked plaintiff why he was on the ground, and
19 plaintiff asked for medical attention. *Id.* at 17. The deputy allegedly merely pointed at the
20 emergency call button and walked away. *Id.* Sometime later, a medical employee walked by
21 plaintiff's cell. *Id.* Plaintiff got the employee's attention and told the employee that he had lost
22 consciousness, fell and hit his head, and that he needed medical attention. *Id.* The employee used
23 a light to look in plaintiff's eyes and told plaintiff he was deaf in his left ear due to ear wax build
24 up. *Id.* The employee gave plaintiff ear drops for the wax and provided no other medical
25 assistance. *Id.*

26 On April 3, plaintiff alleges that Mendoza conducted an ear exam and pulled wax from
27 plaintiff's left ear. *Id.* at 18. Plaintiff continued to assert that he was deaf in that ear, and
28 Mendoza told plaintiff to keep using the wax drops. *Id.* Plaintiff asserts that he also complained

6

1  about his foot, again noting the condition of his wound. *Id.* Mendoza allegedly sent plaintiff
2  back to his cell without further medical assistance. *Id.*

3  Plaintiff alleges that he continued to receive saline cleanses in his wound, and on April 22,
4  during one of these routine cleanings, the unidentified medical employee noticed plaintiff's
5  wound was black and discharging a thick fluid. *Id.* The employee sent plaintiff to the hospital,
6  where he received additional medical treatment. *Id.* at 18-19. At the hospital, plaintiff was
7  informed that he needed another amputation due to the gangrene. *Id.* at 19. Plaintiff's pinky toe
8  and parts of his foot were amputated, leaving plaintiff with only his fourth right toe. *Id.* Upon
9  discharge, plaintiff was again told that his wound needed to be treated with betadine, and this
10 information was given to SJCJ medical staff. *Id.* Nevertheless, plaintiff's wound continued to be
11 treated with saline. *Id.*

12 On May 11, Fanzia conducted a visual examination of plaintiff's foot. *Id.* at 20. Plaintiff
13 alleges that he complained about his foot's condition, and Fanzia stated they would "keep an eye
14 on it." *Id.* Plaintiff alleges that he continued to receive saline-only treatments to his wound, and
15 he continued to complain to Doe defendants about his treatment. *Id.* at 20-21.

16 Plaintiff alleges that his criminal retrial began on June 1, and once it finished on June 23,
17 he was sent to the hospital due to the condition of his foot. *Id.* at 21. He contends that, during
18 this period, his foot had become so bad that medical staff wore masks to protect themselves from
19 the odor that emanated from plaintiff's wound. *Id.* Once he was transported to the hospital after
20 his retrial, he alleges that his right foot was "completely black." *Id.* at 22. He received a blood
21 transfusion and other medical treatment, and ultimately, on June 26, more of his foot was
22 amputated. *Id.*

23 After the amputation, plaintiff alleges he was sent back to SJCJ. *Id.* at 23. Then, on
24 November 11, 2024, he was taken to an ear, nose, and throat specialist to be fitted for a hearing
25 aid due to the deafness in his left ear. *Id.* He contends that the specialist informed him that, had
26 he received treatment after his March 2023 fall, he could have avoided becoming permanently
27 deaf in that ear. *Id.* Plaintiff asserts that the medical care he received for both his right foot and
28 his left ear was inadequate under the Fourteenth Amendment. *Id.* at 5.

A pretrial detainee's claim of inadequate medical care is analyzed under the Fourteenth Amendment, which is evaluated under an objective deliberate indifference standard. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018). To bring such claim, a plaintiff must allege that: (i) defendant made an intentional decision regarding plaintiff's conditions of confinement; "(ii) those conditions put the plaintiff at substantial risk of suffering serious harm;" (iii) "defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Id.* at 1125.

As to the first element, a defendant's inaction can qualify as an intentional decision if the defendant chose to not act. *See Fromer v. Cnty. of Riverside*, No. EDCV 24-2047-KK-SHKx, 2025 WL 819719, at * 4-5 (C.D. Cal. Feb. 5, 2025) (finding plaintiff sufficiently alleged that defendant made an intentional decision to deny him medical care when defendant chose to not address plaintiff's medical needs adequately); *see also Tater v. City of Huntington Beach*, No. 8:20-CV-01772-MEMF-JDEx, 2023 WL 4291656, at *13 (C.D. Cal. May 8, 2023) (finding an officer made an "intentional decision" to provide inadequate medical care to a pre-trial detainee by ignoring their cries for psychiatric help).

To the second element, the operative question is "[w]as there a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff suffered?" *Fromer*, 2025 WL 819719, at *5 (quoting *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (internal quotation marks omitted). A "substantial risk of serious harm" exists where plaintiff has a "serious medical need," where the "failure to treat" the condition "could result in further significant injury or the unnecessary and wanton infliction of pain." *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022) (quoting *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc)) (internal quotation marks omitted). This objective standard also includes the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily

activities; or the existence of chronic and substantial pain." *Id.* (quoting *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (internal quotation marks omitted).

Regarding the third element, plaintiff's allegations must show that a defendant's conduct was objectively unreasonable, which depends on the facts and circumstances of a particular case. *Gordon*, 888 F.3d at 1125. A simple lack of due care is insufficient to state a claim, but a plaintiff need not allege subjective elements about a defendant's actual awareness of the level of risk. *Id.*; *see Fromer*, 2025 WL 819719, at *6 (finding plaintiff sufficiently alleged that defendant did not take reasonable steps to abate the risk of harm when it took plaintiff a year to receive his sleep apnea machine, plaintiff submitted multiple grievances about his medical needs, and suffered other medical issues waiting for proper medical care); *see also Sandoval*, 985 F.3d at 670 (finding the defendant's limited action of giving plaintiff a quick blood test and then ignoring him for the remaining six hours of defendant's shift could constitute reckless disregard).

To the fourth element, a plaintiff need only allege "a sufficiently imminent danger, because a remedy for unsafe conditions need not await a tragic event." *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (citation and internal quotation marks omitted).

As an initial matter, to the extent plaintiff brings his claims against Sheriff Withrow and Captain Cortez, such claims are not cognizable. To be held liable in a § 1983 suit, plaintiff must allege that a defendant personally participated in the alleged constitutional violation. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002); *see also Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) ("The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."). Plaintiff's complaint does not allege that Withrow or Cortez participated in any alleged wrongdoing, and so the complaint states no claims against them.

Plaintiff also fails to state a cognizable claim against defendant Vos. As the allegations currently read, Vos only saw plaintiff once on October 26, 2022. *See* ECF No. 1 at 9. Vos sent plaintiff to the hospital upon seeing his foot's condition. *See id.* As such, plaintiff's allegations against Vos fail to allege that Vos put the plaintiff at substantial risk of suffering serious harm,

9

1 that she did not take reasonable available measures to abate that risk, or that she caused plaintiff's
2 injuries. *See Gordon*, 888 F.3d at 1125. Thus, plaintiff fails to state a claim against Vos.

3 Similarly, plaintiff fails to state a cognizable claim against Rosalisa for her actions related
4 to plaintiff's foot. Plaintiff alleges that Rosalisa refused to examine the blister on his right big toe
5 on August 31 and September 7. *See* ECF No. 5. Without more, these allegations simply show
6 that Rosalisa lacked due care when treating plaintiff, which is insufficient to state Fourteenth
7 Amendment claim. *See Gordon*, 888 F.3d at 1125.

8 However, for the purposes of screening, plaintiff has stated cognizable claims against Dr.
9 Kym, Plosser, Mendoza, Fanzia, Darren, and the Doe defendants related to the care he received
10 for his foot. To plaintiff's allegations against Dr. Kym, Dr. Kym sent plaintiff to the hospital for
11 his first amputation on September 15. *See* ECF No. 1 at 6. However, upon plaintiff's return from
12 the hospital, Dr. Kym allegedly performed one follow-up with plaintiff where he told plaintiff he
13 needed to ensure medical staff were putting betadine on his wounds and that plaintiff needed to
14 avoid placing pressure on his wound. *See id.* at 7-8. While Dr. Kym made these statements to
15 plaintiff, allegedly he personally did not take any actions to ensure plaintiff's wound would
16 receive betadine and did not give plaintiff any walking assistance to ensure he could alleviate
17 pressure on his wound. *See id.* These purported failures led to plaintiff's wound to be continually
18 cleaned with only saline and he continued to have parts of his foot amputated due to infections
19 over the next year. As such, plaintiff has sufficiently alleged that Dr. Kym made an intentional
20 decision regarding plaintiff's conditions of confinement which placed plaintiff at substantial risk
21 of suffering serious harm, and that Dr. Kym did not take reasonable available measures to abate
22 that risk, causing plaintiff injuries. *See Gordon*, 888 F.3d at 1125.

23 The same is true for defendant Plosser. Plaintiff alleges that on November 15, Plosser
24 refused to clean plaintiff's wound with betadine, although he requested it. *See* ECF No. 1 at 10.
25 Plosser would not obtain additional medical assistance for plaintiff's worsening foot conditions
26 for almost a month, when he was finally taken to the hospital due to running a 103-degree fever.
27 *See id.* at 10-12. Plaintiff alleges that he complained about his foot's condition, but Plosser
28 ignored his complaints and continued cleaning his wound with just saline, ultimately leading to

10

1 plaintiff enduring additional amputations. *See id.* Thus, plaintiff has sufficiently alleged that
2 Plosser made an intentional decision regarding plaintiff's conditions of confinement which placed
3 plaintiff at substantial risk of suffering serious harm, and that Plosser did not take reasonable
4 available measures to abate that risk, causing plaintiff injuries. *See Gordon*, 888 F.3d at 1125.

5 To Mendoza, plaintiff has sufficiently alleged that she provided inadequate medical care
6 to both plaintiff's foot injury and his ear injury. Related to plaintiff's foot, Mendoza prescribed
7 plaintiff antibiotics when he first complained to her about his foot. *See* ECF No. 1 at 15.
8 However, a month later, Mendoza allegedly refused to follow up with plaintiff about his
9 worsening foot conditions and refused to look at his foot while she was examining plaintiff's ear,
10 even though Mendoza knew she had prescribed plaintiff antibiotics the month prior for an
11 infection. *See id.* at 18. These allegations sufficiently allege that Mendoza made an intentional
12 decision regarding plaintiff's conditions of confinement which placed plaintiff at substantial risk
13 of suffering serious harm, and that Mendoza did not take reasonable available measures to abate
14 that risk, causing plaintiff injuries. *See Gordon*, 888 F.3d at 1125.

15 The same is true for plaintiff's injuries surrounding his ear injury. Plaintiff alleges that he
16 fell and suffered head trauma, causing him to go deaf in one ear. When Mendoza conducted her
17 exam of his ear, she pulled ear wax out and told plaintiff to continue using ear wax drops. *See*
18 ECF No. 1 at 18. Plaintiff continued to assert that he was deaf, and that it was not due to wax
19 build-up, but Mendoza allegedly refused to conduct additional testing or examinations to find the
20 root cause of plaintiff's sudden deafness. *See id.* This led to plaintiff needing hearing aids and
21 permanently losing hearing in his ear. As such, plaintiff has sufficiently alleged that Mendoza
22 failed to provide adequate medical care under the Fourteenth Amendment. *See Gordon*, 888 F.3d
23 at 1125.

24 Similarly, plaintiff states a cognizable claim against defendant Fanzia and Darren for their
25 alleged inadequate care of his wounds. Plaintiff alleges that Fanzia examined his foot, which was
26 swollen, discolored, and discharging a thick, foul-smelling liquid, but Fanzia failed to give
27 plaintiff medical assistance. *See* ECF No. 1 at 20. Instead, Fanzia told plaintiff, "we'll keep an
28 eye on it" and sent him back to his cell. *See id.* Thereafter, more of plaintiff's foot had to be

amputated. *See id.* at 21-22. Similarly, Darren examined plaintiff's foot, which was swollen, discolored, and discharging a foul-smelling liquid, and Darren allegedly did not give plaintiff additional medical assistance. *See id.* at 13. Again, more of plaintiff's foot had to be amputated due to infections. *See id.* Thus, plaintiff has sufficiently alleged that Fanzia and Darren made intentional decisions regarding plaintiff's conditions of confinement which placed plaintiff at substantial risk of suffering serious harm, and that neither took reasonable available measures to abate that risk, causing plaintiff injuries. *See Gordon*, 888 F.3d at 1125.

Finally, as for the Doe defendants, plaintiff has sufficiently alleged that these defendants provided him inadequate medical care under the Fourteenth Amendment. Plaintiff alleges that these defendants continued to clean his wounds with saline only, although plaintiff's wound continued to become infected, and his discharge paperwork directed that the wound be treated with betadine. These actions led to plaintiff to suffer more infections and amputations. The fact that plaintiff alleges that these Doe defendants collectively provided him inadequate care connected to the saline-only treatments does not defeat his claim, because "collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016). As such, plaintiff has sufficiently alleged a Fourteenth Amendment inadequate medical care claim against Does 5 through 50.

Plaintiff may either notify the court that he wishes to proceed only with his Fourteenth Amendment inadequate medical care claims against Dr. Kym, Plosser, Mendoza, Fanzia, Darren, and the Doe defendants, in which case I will direct service, or plaintiff may elect to amend his complaint. If plaintiff amends his complaint, I will delay serving any defendant and will screen his amended complaint in due course. Plaintiff is reminded that any amended complaint will supersede the current one. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 907 n.1 (9th Cir. 2012) (en banc). The amended complaint should be titled "First Amended Complaint" and refer to the appropriate case number.

Accordingly, it is hereby ORDERED that:

1. Plaintiff's motion to proceed *in forma pauperis*, ECF No. 6, is DENIED as moot.

2. The previously issued Order and Findings and Recommendations, ECF No. 7, VACATED.

3. Within thirty days from the service of this order, plaintiff must indicate his intent to proceed only with his Fourteenth Amendment inadequate medical care claims against Dr. Kym, Plosser, Mendoza, Fanzia, Darren, and Does 5 through 50, or he must file an amended complaint. If he selects the latter, no defendants will be served until the new complaint is screened.

4. The Clerk of Court shall send plaintiff a § 1983 complaint form with this order.

IT IS SO ORDERED.

Dated:   June 23, 2025

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE

13